[Cite as *Cutler v. Reed*, 2016-Ohio-1151.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| BRUCE CUTLER<br>o.b.o. CARLY PAVEY, | : | CASE NO.   CA2015-06-105 |
|  | : |  |
| Petitioner-Appellee, | : | O P I N I O N<br>3/21/2016 |
|  | : |  |
| - vs - | : |  |
|  | : |  |
| AMARINDA REED, | : |  |
|  | : |  |
| Respondent-Appellant. | : |  |
|  | : |  |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CP2014-10-0517

Bruce Cutler o.b.o. Carly Pavey, 7350 Avenel Court, West Chester, Ohio 45069, petitioner-appellee, pro se

Robert H. Lyons, 8310 Princeton-Glendale Road, Suite B, West Chester, Ohio 45069, for respondent-appellant

**M. POWELL, P.J.**

{¶ 1}   Respondent-appellant, Amarinda Reed, appeals the decision of the Butler County Court of Common Pleas granting a civil stalking protection order against her and in favor of petitioner-appellee, Bruce Cutler on behalf of Carly Pavey, his then 17-year-old stepdaughter.  For the reasons outlined below, we affirm.

{¶ 2} This case is the result of an ongoing dispute between two teenage girls. On October 31, 2014, Cutler filed a petition for a civil stalking protection order against Reed on Pavey's behalf. In support of his petition, Cutler alleged Reed, who lives nearby in the same neighborhood, harassed Pavey over the Internet, established a fake Twitter account in Pavey's name, followed Pavey home from school, egged Pavey's car, and toilet papered Pavey's house. Cutler also alleged Reed "came into [Pavey's] workplace and reported harassment to her boss." Later that day, a magistrate held an ex parte hearing on the matter, during which time the magistrate heard testimony from Cutler, Pavey, and Pavey's mother. Following this hearing, the magistrate granted Cutler a temporary ex parte civil stalking protection order against Reed. The matter was then scheduled for a full hearing, which was conducted before the same magistrate on December 5, 2014.

{¶ 3} At the December 5, 2014 hearing, Pavey testified she had been friends with Reed for some time, but that their friendship deteriorated in March 2014 after they had a "big argument" about an "incident that she was telling multiple people about with her and a boy and I did not believe that this incident had happened[.]" Following this argument, Pavey testified she decided not to talk to Reed and thought it best to "completely separate" herself from Reed. However, although attempting to avoid Reed, Pavey testified she found herself in another argument with Reed during an online group chat session with Reed and several of her friends. As a result of this argument, Pavey testified Reed "called the police saying that I was causing issues," to which the responding officer suggested that both girls simply stop talking to each other. Pavey testified she then blocked Reed from "Instagram, Snapchat, Facebook, every social media possible" and agreed "not to hang out with [Reed] or anything like that."

{¶ 4} Nevertheless, Pavey also testified she believed Reed had previously egged her car, and that Reed had since created a fake Twitter account in Pavey's name, called Pavey's

boyfriend, and posted a picture of Pavey on Instagram calling her a "skank." Pavey further testified that Reed, along with two of Reed's friends, went to the restaurant where Pavey worked and ordered a single piece of pie. As Pavey testified, this caused her stress and scared her because she "didn't want to take care of them as a server." Pavey also testified Reed later called the restaurant and made a false complaint against her, something which her general manager testified caused Pavey to break down and cry hysterically.

{¶ 5} Pavey further testified that Reed had followed her home from school and had on one occasion passed her over a double yellow line before "hitting her brakes." According to Pavey, this caused her to be "worried and scared" that Reed would cause an accident. Pavey also testified that Reed had twice driven by her house with some of her friends who proceeded to yell and make obscene gestures towards her. It is undisputed that Pavey's house is located at the end of a cul-de-sac on a different street than Reed's.

{¶ 6} Due to Reed's purported harassment, Pavey testified she became so upset that she posted a message online saying "[s]omething along the lines of if I decide to commit suicide, it will be because of Amarinda Reed." When asked why she made the posting, Pavey testified that she was "very upset with what had been going on with Amarinda Reed and then I just kind of posted it in the moment because I was really upset." Pavey further testified that she was "really stressed," that she had lost friends, and that she was scared and wary of other people as a result of Reed's actions. Pavey also testified that she had sought help on how to deal with Reed from her high school guidance counselor.

{¶ 7} Pavey's mother provided similar testimony at the full hearing. For instance, Pavey's mother testified she had received a panicked call from Pavey claiming Reed was following her home, a short time later seeing Reed drive by the house while another girl yelled obscenities at Pavey with "both her hands out the window giving [her] the finger." On another occasion, Pavey's mother testified she saw Reed drive by the house with "some

boys" and "one or two other girls" who were "screaming and yelling" at Pavey as she walked home from the neighborhood swimming pool. Thereafter, when asked why she thought a civil stalking protection order against Reed was necessary, Pavey's mother testified "[b]ecause at this point, we feel like there's no other course for us." Pavey's mother also testified that "[i]t's disrupting our home life, my other kids. We're missing work. We want it to stop. We've asked it to stop."

{¶ 8} Detective Kyle Smith of the West Chester Police Department also testified. Detective Smith testified he was assigned to investigate a complaint Cutler had filed against Reed alleging identity theft and telecommunications harassment regarding the fake Twitter account established in Pavey's name. As a result of this investigation, Detective Smith determined the IP address used to create the fake Twitter account was registered to Reed's mother. Detective Smith then testified he interviewed Reed about the fake Twitter account, which caused Reed to become "very nervous." In further describing Reed's demeanor, Detective Smith testified Reed's "attitude changed" when asked about the fake Twitter account, and that "[t]here was a lot of personal grooming. There was – she took * * * quite a lengthy time to answer certain questions." Detective Smith also testified that Reed "seemed like she was trying to buy time to come up with an explanation of some of my questions. She offered some in my opinion what were some weak answers to some of my questions."

{¶ 9} In her defense, Reed testified that she did not egg Pavey's car, but was present when the egging occurred, having driven the culprit to the store to purchase eggs. Reed further testified that the argument between her and Pavey that arose during the online group chat session was the result of Pavey insulting her parents and her education, calling her names, and making threatening comments towards her. Reed also denied ever going to the restaurant where Pavey worked and ordering a single piece of pie to split with two other girls. As Reed testified, "I heard about it, because they told me about it but I believe I was at work

- 4 -

or something." Reed did admit, however, to calling Pavey's work and complaining to the general manager that Pavey "just told us she hates us," a statement that Pavey denied ever making.

{¶ 10} Reed further denied following Pavey home from school or to driving recklessly through the neighborhood, instead claiming it was actually Pavey who was driving dangerously. Specifically, Reed testified:

> We were driving home from school because we both – she picks up her brother and I pick up my brother and sister [and a friend]. It's a two lane – It's on Dayton Road we were on. It's a two and it turns into one lane. I was in the left hand lane, she was in the right hand lane. The right lane ends, so I was in the lane that does not end and she would not – she was trying to get – she was staying in consistent, she was driving at the same speed I was and merging over at the same time. So If I had not sped up or slowed down, she would have ended up hitting my car. I sped up, she sped up as well and I ended up going into the double – the yellow lines in between the opposite way of traffic.

{¶ 11} Reed also denied ever yelling or making any obscene gestures towards Pavey as she drove by Pavey's house, but acknowledged that her friends in the car may have. According to Reed, "[i]f, I believe [a boy] might have said something, but then again, I don't know. I don't remember." Reed also denied ever creating a fake Twitter account in Pavey's name, again claiming that it could have been set up by any one of her friends who have access to her home's Wi-Fi password.

{¶ 12} Following this hearing, on December 9, 2014, the magistrate issued a decision granting Cutler a civil stalking protection order against Reed on Pavey's behalf. Thereafter, on December 15, 2014, Reed filed an objection alleging the "petition was without merit and should have been dismissed." Reed then supplemented her objection on January 23, 2015 by filing the transcripts of both the October 31, 2014 ex parte hearing and December 5, 2014 full hearing. One month later, on February 23, 2015, the trial court issued its decision sustaining Reed's objection upon finding the magistrate "failed to make a finding," thereby

remanding the matter to the magistrate "for the purposes of making findings."

{¶ 13} On March 4, 2015, approximately one week after the trial court had remanded the matter to the magistrate, Reed filed a motion to remove the magistrate from the proceedings due to the magistrate's alleged "bias and prejudice" exhibited against her during the October 31, 2014 ex parte hearing. However, after reviewing both the October 31, 2014 and December 5, 2014 hearing transcripts, the trial court issued a decision denying Reed's motion. In so holding, the trial court found that although the magistrate "used what could be considered derogatory remarks regarding [Reed] and her family" during the October 31, 2014 ex parte hearing, when read as a whole, and when taken in context, the trial court did not find "a bias that pervades these proceedings." The trial court also noted that due to the timing of Reed's motion, it appeared that Reed was merely "attempting to avoid an unfavorable finding of both law and fact by belatedly raising the issue of disqualification."

{¶ 14} On March 20, 2015, the magistrate issued an amended decision again granting Cutler a civil stalking protection order against Reed on Pavey's behalf. Reed then filed an objection, claiming the magistrate was biased against her and that the evidence presented was insufficient to support the granting of a civil stalking protection order. The trial court subsequently denied Reed's objection and adopted the magistrate's granting of the civil stalking protection order. Specifically, after reviewing the transcript of the December 5, 2014 full hearing, the trial court found Reed "was directly involved in, facilitated, or was implicit in events that caused [Pavey] mental distress," and "further demonstrated that [Pavey] was alienated from her friends, harassed at home and work, contemplated suicide, and sought out her school counselor for guidance regarding issues involving [Reed]."

{¶ 15} Reed now appeals from the trial court's decision, raising two assignments of error for review.

{¶ 16} Assignment of Error No. 1:

{¶ 17} THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO REMOVE THE MAGISTRATE.

{¶ 18} In her first assignment of error, Reed argues the trial court erred by denying her motion to remove the magistrate from the proceedings and remand the matter for a new full hearing to be held. We disagree.

{¶ 19} Civil stalking protection orders are generally governed by Civ.R. 65.1. *Wulf v. Opp*, 12th Dist. Clermont No. CA2014-10-074, 2015-Ohio-3285, ¶ 16. That rule, however, "does not affect the applicability of Civ.R. 53(D)(6) to the present matter." *J.B. v. Harford*, 9th Dist. Summit No. 27231, 2015-Ohio-13, ¶ 36. Pursuant to Civ.R. 53(D)(6), "[d]isqualification of a magistrate for bias or other cause is within the discretion of the court and may be sought by motion filed with the court." In turn, this court reviews a trial court's decision on whether to remove a magistrate from the proceedings under an abuse of discretion standard. *In re Baby Girl Elliott*, 12th Dist. Butler No. CA2003-10-256, 2004-Ohio-3539, ¶ 55. In order to find an abuse of discretion, this court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Deference is always due in an abuse-of-discretion case." *State ex rel. Nese v. State Teachers Retirement Bd. of Ohio*, 136 Ohio St.3d 103, 2013-Ohio-1777, ¶ 28.

{¶ 20} "The terms 'bias' or 'prejudice' refer to 'a hostile feeling or spirit of ill will on the one hand, or undue friendship or favoritism on the other, toward one of the litigants or his or her attorneys, with a formation of a fixed anticipatory judgment on the part of a judge as distinguished from an open state of mind which will be governed by the law and the facts.'" *Hurst v. Hurst*, 5th Dist. Licking No. 12-CA-70, 2013-Ohio-2674, ¶ 67, quoting 22 Ohio Jurisprudence 3d 203, Courts and Judges, Section 126 (1988). A magistrate is presumed not to harbor any bias or prejudice against any party in any proceeding. *Melick v. Melick*, 9th

Dist. Summit No. 26488, 2013-Ohio-1418, ¶ 9. A party alleging bias or prejudice must therefore present evidence to overcome that presumption. *Hayden v. Hayden*, 12th Dist. Warren No. CA2003-08-081, 2004-Ohio-6483, ¶ 6.

{¶ 21} In this case, Reed argues the magistrate exhibited strong bias and a high degree of antagonism towards her during the October 31, 2014 ex parte hearing, which resulted in a fundamentally unfair hearing and denied her due process of the law when that same magistrate presided over the December 5, 2014 full hearing. Reed, however, does not raise any challenge alleging the magistrate exhibited any bias or prejudice towards her at the December 5, 2014 full hearing. In other words, Reed does not claim the magistrate impeded her defense by restricting her examination and cross-examination of witnesses, her presentation of evidence, or that Cutler was permitted to present otherwise inadmissible evidence. Similarly, Reed also does not claim the trial court judge exhibited any bias or prejudice in his review of the magistrate's decision granting the civil stalking protection order against her, nor does Reed allege the trial court judge was biased in his review of her objections to the magistrate's granting of such order.

{¶ 22} Rather, without advancing any argument that the evidentiary record is somehow compromised due to the magistrate's alleged bias or prejudice towards her, Reed merely argues the magistrate was inclined to rule against her and failed to consider the evidence presented at the full hearing in a fair and impartial manner. However, the trial court reviewed the entire record in light of the magistrate's alleged bias and prejudice against Reed. After considering the trial court's review of the record, we find Reed has not demonstrated how the trial court abused its discretion by refusing to remove the magistrate and remand the matter for a new full hearing. Moreover, even if we were to find some error in the trial court's decision, which we do not, we find any alleged bias or prejudice exhibited by the magistrate is rendered harmless by virtue of the trial court's review of the record, as well as this court's

own review of the record upon a substantially similar standard of review to that employed by the trial court pursuant to Civ.R. 65.1(F)(3)(d)(iii).[1]

{¶ 23} In light of the foregoing, we agree with the trial court's decision to deny Reed's motion to remove the magistrate and find the magistrate's comments, while certainly unbecoming, appear to be nothing more than her own personal interjections on the difficulties youths face during their more formative teenage years, particularly with the advent of social media. In so holding, we reiterate that the record is devoid of any evidence indicating the magistrate exhibited any bias or prejudice towards Reed during full hearing conducted on December 5, 2014. In turn, just as the trial court found, this appears to be nothing more than Reed's attempt to "avoid an unfavorable finding of both law and fact by belatedly raising the issue of disqualification." Therefore, while we strongly caution the magistrate to avoid such commentary in the future, based on the facts and circumstances here, we find no abuse in the trial court's discretion to deny Reed's motion to remove the magistrate from the proceedings. Accordingly, Reed's first assignment of error is without merit and overruled.

{¶ 24} Assignment of Error No. 2:

{¶ 25} THE TRIAL COURT ERRED BY GRANTING APPELLEE'S PETITION FOR A CIVIL PROTECTION ORDER.

{¶ 26} In her second assignment of error, Reed argues there was insufficient evidence to support the granting of a civil stalking protection order against her. We again disagree.

{¶ 27} Pursuant to R.C. 2903.214(C)(1), the issuance of a civil stalking protection order requires the petitioner to establish that the respondent engaged in conduct constituting

---

1. Pursuant to Civ.R. 65.1(F)(3)(d)(iii), a trial court reviews a magistrate's decision to grant or deny a civil stalking protection order based upon whether "the credible evidence of record is insufficient to support the granting or denial of the protection order. Our review on appeal of the granting or denial of a civil stalking protection order is "whether there was sufficient credible evidence to prove by a preponderance of the evidence that the petitioner was entitled to relief." *Fouch v. Pennington*, 12th Dist. Clermont No. CA2011-10-075, 2012-Ohio-3536, ¶ 9.

menacing by stalking. *Lane v. Brewster*, 12th Dist. Clermont No. CA2011-08-060, 2012-Ohio-1290, ¶ 18. As defined by R.C. 2903.211(A)(1), "menacing by stalking" means engaging in a pattern of conduct that knowingly causes another "to believe that the offender will cause serious physical harm to the other person or cause mental distress to the other person." In determining what constitutes a pattern of conduct, "courts must take every action of the respondent into consideration even if some of the actions in isolation do not seem particularly threatening." *Opp*, 2015-Ohio-3285 at ¶ 7, citing *Middletown v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, ¶ 10 (12th Dist.).

{¶ 28} A preponderance of the evidence standard applies to the trial court's decision granting a civil stalking protection order. *Henry v. Coogan*, 12th Dist. Clermont No. CA2002-05-042, 2002-Ohio-6519, ¶ 15. In turn, "[w]hen assessing whether a civil stalking protection order should have been issued, the reviewing court must determine whether there was sufficient credible evidence to prove by a preponderance of the evidence that the petitioner was entitled to relief." *Fouch v. Pennington*, 12th Dist. Clermont No. CA2011-10-075, 2012-Ohio-3536, ¶ 9. "Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *Eckstein v. Colian*, 7th Dist. Columbiana No. 11 CO 22, 2012-Ohio-4038, ¶ 14.

{¶ 29} As noted above, Reed argues there was insufficient evidence to support the granting of a civil stalking protection order against her. In support of this claim, Reed argues that such orders "should be reserved for significant matters of consequence, not for the sophomoric behavior of teenage girls." However, contrary to Reed's claims the record clearly indicates Pavey had been subject to Reed's ongoing and repeated harassment in person and over the Internet for a period of several months, claims that were generally corroborated through the testimony of Pavey's mother, Detective Smith, and that of Reed herself.

{¶ 30} Specifically, Pavey testified that she believed Reed egged her car, created a fake Twitter account in her name, and posted a picture of her on Instagram calling her a "skank." Pavey also testified that Reed had called her boyfriend, came to her work and made a false complaint against her, followed her home from school, and drove past her in a reckless manner, thus causing Pavey to become "worried and scared" that Reed would cause an accident. Pavey further testified that Reed and her friends had twice driven by her house yelling and making obscene gestures towards her. Therefore, while Reed suggests otherwise, we find this goes well beyond the type of behavior that can simply be dismissed as typical teenage antics.

{¶ 31} As a result of Reed's harassment, the trial court found Pavey had been alienated from her friends and suffered mental distress, thus causing Pavey to post a message regarding her thoughts of suicide and to seek help from her school guidance counselor. "It is the duty of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's actions." *Pennington*, 2012-Ohio-3536 at ¶ 13. Therefore, after a thorough review of the record, we find no error in the trial court's decision. Accordingly, because we find there was sufficient credible evidence to prove by a preponderance of the evidence that Cutler was entitled to a civil stalking protection order against Reed on Pavey's behalf, Reed's second assignment of error is also without merit and is overruled.

{¶ 32} Judgment affirmed.

PIPER, J., concurs.

HENDRICKSON, J., concurs separately.

**HENDRICKSON, J., concurring separately.**

- 11 -

{¶ 33} I concur in the foregoing opinion, but write separately to emphasize the importance the role of judges and magistrates are in protecting the integrity of the judiciary. The magistrate's improper comments in this case cannot be ignored. The comments do nothing to promote the public's confidence in the integrity and impartiality of the judiciary, as mandated under Rule 1.2 of the Ohio Rules of Judicial Conduct. Here, the magistrate made numerous improper comments about Reed to Pavey during the ex parte hearing, saying, "idiots like this," "it's not fair that you've had to eliminate what you like to do because of this idiot," "parents haven't had control over her for some time," "because she is such a miserable person," and "[y]ou have respect, self-respect, and you deserve to have that kept intact and not be violated by some troll who has nothing better to do with her miserable life."

{¶ 34} The magistrate also advised and encouraged Pavey, who was represented by an attorney but appeared pro se, to file criminal charges for the actions Reed allegedly committed against her. The magistrate exceeded her neutral and impartial position by providing Pavey with examples of criminal charges that could be filed, such as assault, menacing, vandalism, trespassing, and telephone harassment. The magistrate informed Pavey that she could file the charges herself if the police would not file the charges.

{¶ 35} The magistrate's comments, which were directed towards a litigant, erode the public's confidence in our judicial system—a system founded upon the principles of fairness and impartiality. This is why the Preamble to the Code of Judicial Conduct states, in pertinent part, the following:

> [1] An independent, *fair, and impartial judiciary is indispensable* to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, *the judiciary plays a central role in preserving the principles of justice and the rule of law.* Inherent in all the rules contained in this code are the *precepts that judges*, individually and collectively, must respect and honor the judicial office as a *public*

- 12 -

*trust* and *strive to maintain and enhance confidence in the legal system.*

[2] Judges should maintain the dignity of judicial office at all times and avoid both impropriety and the appearance of impropriety in their professional and personal lives. *They should aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence.*

(Emphasis added.)

{¶ 36} Although the magistrate made improper comments at the ex parte hearing, I nonetheless concur with my colleagues and find that the trial court did not abuse its discretion by denying Reed's motion to disqualify the magistrate. In examining the ex parte proceeding as a whole, it is apparent that the magistrate attempted to mentor Pavey by emphasizing the importance of looking at a person's character before making the decision to befriend and let the person into her life.

{¶ 37} I also find that the trial court did not err in granting Cutler a civil stalking protection order on Pavey's behalf. Reed cannot demonstrate that she did not receive a fair trial when the record reveals that she openly admitted to participating in many of the bullying and abusive actions taken against Pavey. At a minimum, Reed was a co-conspirator.

{¶ 38} Accordingly, for the reasons expressed above, I agree that affirming the trial court's decisions not to disqualify the magistrate and to issue the protection order is proper. In so affirming, however, I urge all who serve in a judicial capacity to remember that we must fulfill our judicial duties in such a manner that ensures the greatest possible public confidence in the judicial system.